Gloria J. Cater & another[1] *vs.* Robert Bednarek & others,[2] trustees,[3] & others.[4]

Suffolk. February 7, 2012. - June 15, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Easement. Real Property,* Easement. *Estoppel.*

In a civil action to confirm the validity of an easement over property that subsequently had been subdivided into numerous lots, and to establish the precise location and characteristics of that easement, the Land Court judge did not err in concluding that the easement was not extinguished by estoppel, where the deed that created the easement did not specify a location, where the owners of the servient estates were hard pressed to demonstrate detrimental reliance as to the entirety of their properties, and where it would not have been reasonable for the owners of the servient estates to have understood from the silence of the owners of the dominant estate an intention to terminate the easement [530-533]; however, while the judge did not err in establishing the location of the easement, this court vacated the judgment and remanded the matter to the Land Court to permit the judge to resolve inherent contradictions as to the width and the finished grade of the roadway [533-536].

Civil action commenced in the Land Court Department on August 21, 1998.

The case was heard by *Gordon H. Piper,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Bruce W. Edmands* for the plaintiffs.

*Thomas Frisardi* for Lucy Clark & others.

[1] Willie J. Cater.

[2] Brenda Boleyn, Betsey Brown, Fred Gaechter, Carol Green, Curtin Hartman, Howard Irwin, John Marksbury, and Joel Searcy.

[3] Of the Truro Conservation Trust.

[4] Lucy Clark, Jennifer Clark Kruger, and Mitch Brock, trustees of the Silvia M. Clark Revocable Trust; Susan B. Cabot, Sylvia Clark, and Joan F. Fox, individually and as trustees of the Cabot-Clark-Fox Real Estate Trust; Joan F. Fox, trustee of the Residence Trust Agreement; and Sara C. Mueller and Philip P. Mueller, III, trustees of the Philip P. Mueller Truro Realty Trust.

*Christopher M. Morrison* for Robert Bednarek & others.

The following were present but did not argue:

*Edward A. Gottlieb* for Joan F. Fox.

*Lois M. Farmer* for Philip P. Mueller, III, & another.

*Andrew M. Higgins* for Susan B. Cabot.

*Paul D. Kiernan*, pro se.

GANTS, J. The plaintiffs, Gloria J. Cater and Willie J. Cater, own a parcel of land (Cater parcel) on a hill overlooking Cape Cod Bay in the town of Truro (town) with no frontage on any street. The parcel, however, has the benefit of an unspecified easement conveyed in an 1899 deed that provides a "right of way" to reach a nearby road. In the century that passed before the plaintiffs filed suit in the Land Court in 1998 to confirm the validity of the easement and to establish its precise location and characteristics, the servient estate had been sold and subdivided into numerous lots and houses had been built on many of the subdivided lots.[5] As a result, the Land Court judge confronted an equitable dilemma: without an easement allowing construction of a roadway[6] from the street to the Cater parcel, the plaintiffs could not build a home on the dominant estate, but any such easement would intersect a subdivided lot and diminish the value and enjoyment of a servient property.

After a phased trial, the judge made detailed findings of fact and in two carefully considered decisions attempted to balance the competing interests of the dominant and servient estates. The judge concluded that the plaintiffs continued to hold a valid easement and placed the easement along the shortest and most direct route between the Cater parcel and the nearest public street that could be reached over the servient estate. The judge chose a route that straddles the property line of two servient subdivided parcels, limited to twelve feet the width of the finished

---

[5]A servient estate is an estate burdened by an easement. A dominant estate is an estate that benefits from an easement (here, the Cater parcel). See *M.P.M. Bldrs., LLC* v. *Dwyer*, 442 Mass. 87, 88 n.2 (2004); Black's Law Dictionary 629 (9th ed. 2009).

[6]The original easement granted a "right of way." The Land Court judge's opinion used the language "driveway or roadway," and described the "easement [as] a general right of way serving a single house." We use the term "roadway" in this opinion.

surface of any roadway constructed within the easement, and established the minimum grade on any roadway built within the easement wherever the natural grade of the terrain was steeper than ten per cent.[7] Appeals and cross appeals were entered in the Appeals Court, and we transferred the case to this court on our own motion.

The defendants claim that the judge erred in failing to find that the easement had been extinguished by estoppel because of the silence of the dominant estate holders over many years regarding the existence of the easement while the servient estate was sold, subdivided, and developed as residential property. The plaintiffs claim that the judge erred in limiting the width of the finished surface of the roadway to twelve feet and imposing other limitations on its construction that they contend will prevent them from obtaining the necessary approval from the town's planning board to construct the roadway they need to build a home on their parcel.

We conclude that the judge did not err in concluding that the easement had not been extinguished by estoppel. We also conclude, however, that the judge erred in limiting the width of the finished surface of any roadway built within the easement to twelve feet where the roadway must conform to the town's rules and regulations governing the subdivision of land, effective September 10, 2007 (subdivision regulations), which require that the minimum width of a roadway for a single-family residence be at least fourteen feet and allow no waiver of this requirement. We therefore vacate the judgment and remand the case to the Land Court for further proceedings consistent with this opinion.

*Background.* The facts are not materially in dispute. The Cater parcel was created in 1899 when Charles W. Cobb carved off and conveyed the northeast corner of his estate to Lorenzo D. Baker by a deed dated September 7, 1899 (1899 deed).[8]

---

[7] The judgment also provides that the costs of designing and constructing the roadway must be borne by the owners of the dominant estate and that they are responsible for the cost of upgrading, repairing, or relocating a septic system if required by the construction.

[8] A copy of a map of the area is attached as an Appendix. The outer enclosed region on that map depicts the land originally owned by Charles W. Cobb. The western edge of the map depicts Cape Cod Bay.

Cobb's remaining estate (Cobb estate) extended eastward to a "proprietor's way" now known as Fisher Road, which at that time was the only road bordering the Cobb estate. In the 1899 deed, Cobb granted to Baker and his successors a "right of way . . . across my land on the east in the road now established."[9] The 1899 deed does not include a more detailed description of either the location or the width of the right of way. No footpath or roadway existed in 1899 across land that had once been part of the Cobb estate to connect the Cater parcel to any street, and none has been established.

Over the next eighty years, the Cobb estate was further divided, transferred, and developed so that by 1976 the estate had been split into nineteen parcels of various shapes and sizes. We relate only the details relevant to this appeal.

In 1908, Cobb's widow[10] conveyed a plot of land by warranty deed to Manuel Fisher (Fisher estate) that was carved out of the Cobb estate and is adjacent to the Cater parcel, and includes the parcels now held by the defendants. The warranty deed stated on a printed form that the property was "free from all incumbrances" and makes no reference to the easement in the 1899 deed.[11]

In 1943, Benson Road, which connected to Fisher Road many of the parcels subdivided from what had been the Fisher estate, was accepted by the town as a public road. Benson Road lies west of Fisher Road, closer to the Cater parcel, so the shortest right of way from the Cater parcel to Fisher Road crosses Benson Road before reaching Fisher Road. To reach Benson Road from the Cater parcel, a right of way must pass through undeveloped land owned by the defendant Truro Conservation Trust (Conservation Trust parcel) and then pass through one of

---

[9]The judge found that the "road now established" referred to the road now known as Fisher Road. No party to this appeal now challenges that portion of the judge's decision.

[10]Cobb's widow had not been a grantor on the 1899 deed of the Cater parcel to Lorenzo D. Baker, but she had been a signatory on that deed for the limited purpose of releasing her dower and homestead rights.

[11]The 1899 deed and the 1908 deed are each conveyances of part of a larger tract of land owned by Cobb. Neither the 1899 nor the 1908 deed references any other deed. Neither the 1899 nor the 1908 deed is in the linear chain of title of the other, but Cobb's original land holdings are recorded at the Barnstable County registry of deeds.

four developed properties with frontage on Benson Road: from north to south, property owned by the Silvia M. Clark Revocable Trust (Clark parcel), Susan Cabot (Cabot parcel), Joan F. Fox, as trustee of the Residence Trust Agreement (Fox parcel), and the trustees of the Philip P. Mueller Truro Realty Trust (Mueller parcel).[12] These four properties were developed at different times: a house was built on the Fox parcel in 1931; on the Mueller parcel in 1948; on the Cabot parcel in 1950; and finally on the Clark parcel in 1969.[13]

The Caters purchased their parcel in 1979 and their deed also recited the right of way created in the 1899 deed. In August, 1998, the Caters commenced this litigation in the Land Court seeking to confirm the existence of the easement recited in the 1899 deed and to determine the location of the right of way.

In 2007, after the first phase of the trial, the judge found that, "although the 1899 [d]eed does not fix precisely the location of the easement, it does establish that the easement is to run in a generally easterly direction from the Cater Parcel over Cobb's land to reach Fisher Road," and, with the subsequent construction of Benson Road, would pass over the Conservation Trust parcel and could potentially burden the Clark, Cabot, Fox, and Mueller parcels, as well as the undeveloped Cabot-Clark-Fox parcel, until it reached Benson Road.

The judge recognized that the Caters and their predecessors in title had not sought to make use of the easement for ninety-eight years, until 1997, and only then informed the defendants of the easement.[14] The judge found, however, that there was no evidence the easement had been extinguished by an express

---

[12]The right of way may also need to cross small strips of undeveloped land adjoining the Clark, Cabot, and Fox parcels on the border with the Truro Conservation Trust parcel (Conservation Trust parcel), owned by the trustees of the Cabot-Clark-Fox parcel.

[13]The deed for the Conservation Trust parcel identifies the 1899 easement benefiting the Cater parcel, but none of the deeds for the Clark, Cabot, Fox, or Mueller parcels identifies the 1899 easement. A 1983 deed for the Fox parcel, however, appears to recognize the possibility of an easement benefiting the Cater parcel because the deed added language attempting to negate such an easement, declaring that no part of the parcel "is to be used in any way to provide means of access or egress to the property or any part thereof . . . of Edgar W. Cobb [*sic*]."

[14]The judge, however, noted that the existence of the easement has been of

grant or release, or that the Caters or their predecessors in title had abandoned the right of way. The judge noted that the only evidence of abandonment was the nonuse of the easement, and that "the mere non-use of an easement, no matter how long the duration, will not work an abandonment of an easement."[15] The judge found that the construction of houses on these parcels and the passage of time had caused the easement to be modified by prescription in that the easement now had to "steer[] clear" of the houses. However, the judge found that the easement had not been extinguished by prescription because the development of these parcels was not "irreparably inconsistent with the continued existence of the right of way."[16] The judge also found that the easement had not been extinguished by estoppel, because the defendants had failed to show "the substantial and detrimental alteration of position to the extraordinary degree required to declare the easement at an end." He added that he was confident

---

record and discoverable since 1899, and that the defendants had constructive knowledge of its existence.

[15] Abandonment of an easement requires a showing of intent to abandon the easement by acts inconsistent with the continued existence of the easement. *Parlante* v. *Brooks*, 363 Mass. 879, 880 (1973), citing *Sindler* v. *William M. Bailey Co.*, 348 Mass. 589, 592 (1965). See Restatement (Third) of Property (Servitudes) § 7.4 comment b (2000) (Restatement) ("Abandonment is normally used to describe a situation in which a servitude has terminated because all beneficiaries have relinquished their rights to use an easement . . ."). "[N]onuse of itself, no matter how long continued, will not work an abandonment." *Desotell* v. *Szczygiel*, 338 Mass. 153, 159 (1958). See *Willets* v. *Langhaar*, 212 Mass. 573, 575 (1912).

[16] To wholly extinguish an easement by prescription, the "acts of the servient tenant [must be] utterly inconsistent with any right of the dominant tenant, manifestly adverse to every claim by it, and incompatible with the existence of the easement" for at least the prescriptive period of twenty years. *New England Home for Deaf Mutes* v. *Leader Filling Stations Corp.*, 276 Mass. 153, 159 (1931) (*New England Home*). See *Post* v. *McHugh*, 76 Mass. App. Ct. 200, 204-205 (2010), quoting *New England Home, supra* ("To extinguish easement rights, a servient tenant's adverse acts must render use of an easement 'practically impossible for the [twenty-year] period required for prescription' "). See also Restatement, *supra* at § 7.7 (where use of servient property violates easement burdening property and adverse use maintained for prescriptive period, easement modified or extinguished). See generally W.V. Hovey, M. Pill, & D.M. Baird, Real Estate Law § 8.51, at 131-134 (4th ed. Supp. 2011). "Where the acts of the servient tenant render the use of only part of a right of way impossible, the easement is extinguished only as to that part." *Yagjian* v. *O'Brien*, 19 Mass. App. Ct. 733, 736-737 (1985), citing *Brooks* v. *West Boston Gas Co.*, 260 Mass. 407, 410-411 (1927).

that, in the second phase of the trial, he could "fix the right of way in a location and manner" that would minimize the impact on the properties affected, and avoid "substantial or unreasonable harm to any of the defendants."

In 2010, after the second phase of the trial, the judge specified the location of an easement from the Cater parcel that crosses the undeveloped Conservation Trust parcel and two of the Cabot-Clark-Fox parcels, and then straddles the property line between the Clark parcel and the Cabot parcel until it reaches Benson Road.[17] He determined that this right of way was the shortest route from the Cater parcel to Benson Road, and that straddling the property line was the fairest way to spread the burden on the Clark and Cabot properties and would cause the least amount of harm to any one burdened property. In determining the dimensions of the right of way, the judge recognized that he must balance the Caters' right of reasonable access to their property with the defendants' rights "to have the natural environment, their scenic vistas, property values, and privacy preserved." He acknowledged that these rights were in conflict, and that, because of dunes that the easement must cross, "construction of a wide, flat roadway [within the easement] produces increased disturbance of the surrounding landscape."[18]

The judge determined that "a safe and convenient [roadway] does not require more than twelve feet" and ordered that the finished surface of any roadway "is not to exceed twelve (12)

---

[17]The burdened parcels, as they appear in the town of Truro assessor's map, sheet nos. 53 and 54 of the Truro assessor's atlas, are parcels 51 (Clark parcel), 52 (Cabot parcel), 89 and 90 (two of the Cabot-Clark-Fox parcels), and parcel 56 (Conservation Trust parcel). In the Appendix to this opinion, the Cabot-Clark-Fox parcels are not visible but are thin strips of land on the border between the Truro Conservation Trust parcel and the Clark and Cabot parcels, respectively.

[18]The judge rejected arguments that the scope of the Cater easement is limited to what was reasonable in 1899, which essentially meant a right of way that could accommodate a horse and buggy. He correctly concluded that, where the instrument creating the easement does not specify its dimensions, a judge must establish dimensions that are reasonably necessary for the enjoyment of the dominant estate, and should not limit the right of way to the purposes for which the dominant estate was used or the means of transportation in common use at the time the easement was created. See *Hodgkins* v. *Bianchini*, 323 Mass. 169, 172-173 (1948); *Mahon* v. *Tully*, 245 Mass. 571, 577 (1923).

feet in width.''[19] He added that ''[i]ncreasing the width of the [roadway] from twelve feet to fourteen feet substantially increases the amount of the landscape that is disturbed, and there is no countervailing reason to do that.'' The judge also recognized that, in fixing the location of the roadway through the dunes on the Conservation Trust parcel, there was a trade-off between the grade of any roadway built within the easement and its length: the steeper the grade of the road up the dunes to the Cater parcel, the shorter the road would need to be. To shorten the length of the roadway, and thus reduce the impact on the burdened defendants' land, the judge forbade a finished grade of less than ten per cent where the natural grade of the terrain was above ten per cent.

The judge rejected the Caters' argument that a reasonable easement included a finished roadway that complied with the town's regulations governing the subdivision of land, concluding that the subdivision regulations ''are evidence of what might be reasonable [but] are not determinative of what is reasonable.'' The judge declared that he was not bound to fix the location, width, or grade of the easement so that it complied with the town's land use regulations and would be guaranteed approval by its planning board. Rather, he treated the subdivision regulations ''as just one more factor I must balance.'' But he specified that ''nothing in this [j]udgment or the accompanying Phase II [d]ecision shall permit the construction of any [roadway] other than in compliance with all applicable laws, nor without first obtaining all permits and approvals required by law.''

*Discussion.* 1. *Extinguishment of easement by estoppel.* The defendants contend that the judge erred in concluding that the easement was not extinguished by estoppel.[20] They urge us to

---

[19]The judge limited to twelve feet in width the ''finished surface'' of the roadway, not the easement itself. His order did not specify a maximum width of the easement but ordered that the ''[e]asement shall permit, in addition to the width of a twelve-foot driveway or roadway, the construction of drainage features, improvements and site work for roadway support and stabilization, erosion controls, vegetative screening, habitat restoration, and timber guardrail.'' The judge appears to have left the easement width unspecified because there was evidence at trial that the amount of land required to support the construction of these features may vary with the terrain.

[20]On appeal, the defendants do not advance their claim that the judge erred

recognize that an easement may be extinguished by estoppel, and to adopt the elements required for a finding of estoppel set forth in Restatement (Third) of Property (Servitudes) § 7.6 (2000) (Restatement), titled, "Modification or Extinguishment by Estoppel," which provides:

> "A servitude is modified or terminated when the person holding the benefit of the servitude communicates to the party burdened by the servitude, by conduct, words, *or silence*, an intention to modify or terminate the servitude, under circumstances in which it is reasonable to foresee that the burdened party will substantially change position on the basis of that communication, and the burdened party does substantially and detrimentally change position in reasonable reliance on that communication" (emphasis added).

The defendants argue that the silence of the Caters and their predecessors in title while the land between the Cater parcel and Fisher Road was developed "clearly signifies a belief that the easement will not be used," and that the defendants were reasonably permitted to rely on this silence in developing their properties and did so.[21]

Our prior case law has stated that an easement may be extinguished by estoppel. See, e.g., *Emery* v. *Crowley*, 371 Mass. 489, 495 (1976) ("express easement can be extinguished only by grant, release, abandonment, estoppel or prescription"); *Delconte* v. *Salloum*, 336 Mass. 184, 188 (1957) (same). But it appears that no reported appellate case in Massachusetts has found extinguishment of an easement by estoppel or has set forth the relevant legal standard. "Estoppel is based on the policies of preventing the injustice and unjust enrichment that would result if servitude beneficiaries were able to mislead a burdened party into believing that the servitude will be modified or terminated and then to obtain an injunction or judgment for damages when the burdened party violates the servitude."

---

by not finding extinguishment of the easement by abandonment or by prescription.

[21]The Truro Conservation Trust alleges no detrimental reliance, but urges us to accept this view on behalf of the defendants who have developed their parcels.

Restatement, *supra* at § 7.6 comment a (rationale). We conclude that § 7.6 of the Restatement adequately reflects the equitable concerns that must be considered in determining whether an easement should be modified or extinguished by estoppel, and adopt its legal standard.

We also adopt the commentary in the Restatement that reflects the need for caution before modifying or extinguishing an easement by estoppel:

> "These policies [of estoppel] conflict with the policies underlying the Statute of Frauds and recording acts which require that transactions designed to modify or terminate servitudes be evidenced by formal written instruments. Although the balance is struck in favor of preventing injustice, courts should be cautious in applying estoppel, particularly where the servitude in question is of substantial value to the dominant estate."

*Id.*

Here, the defendants claim that they were misled by the silence of the owners of the dominant estate regarding the existence of an easement when the defendants built and improved their homes on the servient land. To prevail on a claim of estoppel based on silence, the defendants must prove that the silence of the owner of the dominant estate communicated an intention to modify or terminate the easement to the owner of the servient estate, which the latter reasonably relied on to its substantial detriment. See *id.* at § 7.6. Generally, silence reasonably may communicate such an intention only where the owner of the dominant estate knows that the owner of the servient estate intends to develop the servient property in a manner that is fundamentally inconsistent with the continued existence of the easement, and it is reasonably foreseeable that the servient estate owner will interpret the dominant estate owner's silence as assent and proceed with the inconsistent development to his detriment. See, e.g., *id.* at § 7.4 comment b (distinguishing estoppel from abandonment as requiring "interaction between benefited and burdened parties and involv[ing] unethical conduct on the part of the servitude beneficiary").

The judge did not err in finding that the easement was not

extinguished by estoppel where the deed that created the ease-
ment did not specify a location, and where the judge found the
defendants "hard-pressed" to demonstrate detrimental reliance
as to the entirety of their properties. The construction of houses
on the Fox parcel in 1931, the Mueller parcel in 1948, and the
Cabot parcel in 1950 was certainly not fundamentally incon-
sistent with the continued existence of the easement, because
the Caters' predecessor in title reasonably would have recog-
nized that the right of way could easily pass through the still
undeveloped Clark parcel to Benson Road. Even when a house
was built on the Clark parcel in 1969, the judge did not clearly
err in finding that the silence of the Caters' predecessor in title
was not fundamentally inconsistent with the continued exist-
ence of the easement because the developed parcels adjoining
Benson Road were sufficiently large to permit the construction
of a roadway to the Cater parcel without substantial detriment
to the development on the servient land. The dominant own-
ers' silence regarding the easement during construction of the
houses could not reasonably be understood to communicate an
intention to terminate the easement as long as a roadway that
would not produce substantial detriment remained possible.[22]

Nor in these circumstances would it have been reasonable for
the servient estate owners to have understood from the silence
of the dominant estate owners an intention to terminate the
easement. The undeveloped Cater parcel is obviously landlocked
on three sides while bounded on the fourth side by Cape Cod
Bay. A right of way through the defendants' parcels is the short-
est route to a public street that does not require permission from
the owner of another property. In these circumstances, it was
not reasonable to infer from their silence that the owners of the
Cater parcel communicated an intention to terminate the only
easement that assured them access to a public way.

2. *Width and grade of easement.* Where the instrument creat-
ing an easement does not fix its location or bounds, a court may
do so in the absence of agreement by the parties. See *Mahoney*
v. *Wilson*, 260 Mass. 412, 414 (1927); *Mugar* v. *Massachusetts
Bay Transp. Auth.*, 28 Mass. App. Ct. 443, 445 (1990). In

---

[22]The plaintiffs and the defendants have proposed at least nine distinct
routes where the easement could be located.

establishing the location and bounds of a right of way, a judge inevitably will confront a conflict between a dominant estate and a servient estate, and "the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the [dominant] and servient estate." Restatement, *supra* at § 4.10 comment b. This generally means that a judge should strike "a balance between minimizing the damage to the servient estate and maximizing the utility to the [dominant estate]," *id.* at § 4.8 comment b, recognizing that the holder of an easement is entitled to use the servient estate "in a manner that is reasonably necessary for the convenient enjoyment" of the dominant estate. *Id.* at § 4.10. We conclude that the judge ably applied these principles in establishing the location of the easement, and did not clearly err in doing so.

The judge's rulings regarding the width and grade of the roadway present more difficult questions. Because the Cater parcel did not have any lot frontage, a home could not be built on that lot in compliance with the town's zoning bylaws unless an access road to the property was designed and built in conformance with the town's subdivision regulations.[23] Under the design standards specified in the subdivision regulations, an access road must have a width of at least fourteen feet, a shoulder of four feet, and a right of way of forty feet. In addition, the design standards permit a maximum grade of eight per cent, which "may be waived, but cannot exceed [ten per cent], for a distance of one hundred (100) feet."

The subdivision regulations also provide that, "[w]here approval is sought for a subdivision on land of a rural or sensitive nature, the [planning board] may, at its discretion, waive strict compliance with the [design standards] in order to allow roads servicing not more than four (4) dwellings to be more in keeping with the rural landscape . . . ." The subdivision regulations limit the discretion of the planning board under this provision,

---

[23]In theory, a zoning variance could be sought to build on the parcel without complying with the subdivision regulations, but no party suggests this is a real possibility where there was no frontage on a public road and the subdivision regulations are designed to address the construction of roads for "*access* to *one* or more lots" (emphasis added).

entitled "Rural Road Alternative," in one regard: "in no instance shall the width of the road surface be waived."

The judge reasonably understood that the rural road alternative could apply to a roadway built within the easement, because the road must cross delicate sand dunes to reach a public way, and that the planning board could waive the design standards to preserve the character of the land. It is not an abuse of discretion for a judge to impose limits on a roadway that comply with design standards in town regulations only if the town planning board in its discretion waives strict compliance with those standards, provided the judgment, as it does here, forbids the construction of any such roadway without permitting approval. If the planning board were in its discretion to deny the waiver, the judgment would not authorize construction of the roadway, and the plaintiffs would need to apply to the judge for a modification of the judgment that either would comply with local laws and regulations without a waiver, or include terms more likely to result in a planning board waiver.

The problem with the judgment here is that it establishes a maximum width of twelve feet for the roadway, which is two feet less than the minimum roadway width in the design standards, and the planning board, under the rural road alternative, is expressly prohibited from waiving the minimum width requirement. The judge appears not to have been aware of this limitation on the planning board's discretion. No party in the litigation brought it to his attention, and the expert witnesses that addressed this point at trial suggested the minimum road width requirement could be waived by the planning board.[24] Therefore, as to the width of the roadway, the judgment suffers from an inherent contradiction: compliance with the judgment cannot be in compli-

---

[24]At trial, one of the defendant's experts, John Michael O'Reilly, was asked whether the subdivision regulation requirement of a "minimum roadway width, not including berms, of fourteen feet" could be waived by the planning board, and answered, "I believe [it has] the ability to waive most of these requirements. I don't know whether or not [it] will." Later, he testified that he prepared a "concept" for a proposed paved right of way, and his "concept was based on a twelve-foot" wide easement. When asked if "in [his] experience, a twelve-foot easement is wide enough for a [roadway]," O'Reilly responded, "For a [roadway]." A second expert for the defendants, Timothy J. Brady, likewise testified that a roadway twelve feet or less in width was adequate.

ance with law, but compliance with law is required by the judgment. We therefore vacate the judgment and remand the case to the Land Court to permit the judge to resolve this contradiction.

On remand the judge should also consider whether there is an inherent contradiction in the judgment as to the requirements regarding the finished grade of the roadway. Under the judgment, where the natural grade of the terrain is above ten per cent, the grade of the finished roadway may not be less than ten per cent. Under the design standards in the subdivision regulations, the maximum grade of a roadway is eight per cent. The standards note that the maximum grade may be waived but cannot exceed ten per cent for a distance of one hundred feet. The rural road alternative provision in the subdivision regulations, however, places no restriction on the planning board's discretion to waive the grade requirement, so it is not clear whether the board may grant a waiver to permit a maximum grade of more than ten per cent or whether any waiver is limited to a maximum grade of ten per cent for a distance of one hundred feet or less. The judge appears to have recognized this ambiguity in the town's subdivision regulations because the judgment provides that, "*absent further order of this court*, the Easement does not permit . . . a finished grade of less than ten (10) percent" (emphasis added).

*Conclusion.* The judgment is vacated and the case is remanded to the Land Court for further proceedings consistent with this opinion.

<div align="right">

*So ordered.*