The plaintiffs, Richard H. and Bonnie B. Pearson, as trustees of the Southwest Trust (the Pearsons), appeal from a Land Court judgment declaring that a right of way easement first recited in a 1927 deed does not reach certain land in Wareham owned by the Pearsons,[4] and does not confer upon them any right to pass and repass to and from their land over what is now Bayberry Road, a private way that the defendant, Bayview Associates, Inc. (Bayview), claims to own. Bayview conditionally cross-appeals from certain findings the judge made after trial. We vacate the judgment, reject Bayview's challenges to the findings, and remand for further proceedings to determine precisely where the right of way emanates from the Pearsons' land onto Bayberry Road.
1. Background. We draw our summary of the basis of this dispute from the judge's thorough and thoughtful memorandum of decision, issued after a bench trial involving numerous recorded deeds and plans and the testimony of three expert witnesses, a surveyor, and two real estate lawyers who had examined those documents. Before agreeing to hear those witnesses, the judge appropriately made clear that "no matter how good they are," he was "not going to look to ... any kind of lawyer to tell [him] how to read the documents ...." "The basic principle governing the interpretation of deeds is that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances." Sheftel v. Lebel, 44 Mass. App. Ct. 175, 179 (1998). Similar principles govern the interpretation of easements created by conveyances. Ibid. Where all of the evidence consists of documents and testimony explaining them, we may be in as good a position as the judge to decide issues of fact. See Stamper v. Stanwood, 339 Mass. 549, 551 (1959). Nevertheless we will review his findings of fact for clear error; we review his conclusions of law de novo.
The Pearsons are successors in interest to a roughly four-acre, and roughly rectangular, oceanfront parcel (the locus) earlier conveyed by one Carlton (the grantor) to one Godfrey (the grantee) in 1927, and eventually known as lot 1005. The 1927 deed conveyed, along with the fee to the locus, an easement (the 1927 easement) consisting of "a right of way suitable for the Grantee's purposes from a point at the Northeasterly side of the lot hereby conveyed to said Beach Road," and this same language appears in each subsequent deed conveying the locus. The land adjoining the northeastern side of the locus, also owned by the grantor in 1927, today includes a private way known as Bayberry Road, which connects to a public way known in 1927 as Beach Road.[5]
The grantor, through other deeds and at various times after 1927, conveyed his remaining land around and adjoining the locus to other parties.[6] That land was subdivided; it includes what is now Bayberry Road and adjoining lots on which homes have been built. The defendant Bayview, an association comprised of approximately twenty owners of such homes, claims to own Bayberry Road.
In 1999, the Pearsons divided the locus into lot 1005A (the northwestern portion of the locus), which they conveyed to third parties, and lot 1005B (the southeastern portion), which they retained for themselves. They did not expressly reserve, for the benefit of lot 1005B, any right of way over lot 1005A. Both lots 1005A and 1005B adjoin Bayberry Road along their northeastern boundaries; Buzzards Bay lies along their southwestern boundaries. Lot 1005A currently enjoys access to Bayberry Road (and from there to Beach Road) via a right of way, separate from the 1927 easement, over land lying to the northwest of lot 1005A, owned by the original grantor (Carlton) in 1927, and now owned by third parties (the Russetts). We later refer to that land as the Russett parcel.
Although the 1927 easement established a right of way "from a point at the Northeasterly side of the [locus] to said Beach Road," it did not itself precisely identify that point. The Pearsons-as successors in interest to the 1927 grantee-assert that the right of way begins at a point or points on Bayberry Road where it adjoins their lot 1005B. Bayview-as an association of successors in interest to the 1927 grantor-disagrees, contending that the right of way either begins from a point on Bayberry Road that adjoins lot 1005A (now owned by third parties), or else begins on the northwestern boundary of lot 1005A and runs over the Russett land.
The judge concluded that the 1927 grantor and grantee had "settled on a specific point" and, although its precise location was not stated in the deed and could not now be determined, it was "along what is now Bayberry Road, but just at and very near to the northwest corner of the land conveyed in the 1927 deed." In today's terms, the judge ruled, the easement begins at a point on Bayberry Road that is "at and immediately near the northwest corner of ... [l]ot 1005A" and "in no way reaches to any part of [l]ot 1005B's ... boundary along Bayberry Road." Accordingly, the judge ruled, "[t]he Pearsons, as owners of [l]ot 1005B, have no record right under the 1927 deed to pass to and from their land onto and over Bayberry Road." As a result of that decision, it appears that as a practical matter, unless the Pearsons' lot 1005B has non-record rights, e.g., an easement by prescription,[7] it is inaccessible by land.
Discussion. To determine the existence and attributes of a right of way, we look:
"to the intention of the parties regarding the creation of the easement or right of way, determined from 'the language of the instruments when read in the light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable.' "
Adams v. Planning Bd. of Westwood, 64 Mass. App. Ct. 383, 389 (2005), quoting from Boudreau v. Coleman, 29 Mass. App. Ct. 621, 629 (1990).
Here, the judge based his conclusion that the easement was located at or very near the northwestern corner of the locus on three essential grounds: (1) an interpretation of the phrase "suitable for the Grantee's purposes" as appearing in the 1927 easement; (2) consideration of the so-called Titus Plan mentioned elsewhere in the 1927 deed; and (3) a resulting decision not to apply the principle that unclear language in deeds is construed most strongly against the grantor. Considering each ground in turn, we conclude that, because neither the quoted phrase nor the Titus Plan clearly located the easement at or near the northwestern corner, the deed should be construed against the grantor and the easement is therefore located at or very near to the northeastern corner. Turning to Bayview's cross appeal, we find unpersuasive its arguments that three of the judge's findings rejecting alternative locations for the easement were premature. Finally, we conclude that, on remand, the judge should apply certain equitable principles in determining the exact location and bounds of the easement.
1. "The Grantee's purposes." The Pearsons emphasized at trial that the 1927 easement was required to be "suitable for the Grantee's purposes" and that the grantor could reasonably have anticipated that the grantee might subdivide and develop the locus. Therefore, they argued, the most reasonable interpretation was that the grantor intended to locate the easement at that "point at the Northeasterly side of the [locus]" that was closest to the northeastern (rather than northwestern) corner, because then the easement would allow subdivisions and development of the locus without landlocking any newly created subdivision lots.
The judge disagreed, concluding that the phrase "suitable for the Grantee's purposes" meant only "suitable for the grantee to access Beach Road," as this was "the dominant, and only really explicit, purpose of the right of way-to get out to the road." Accordingly, the judge ruled, not only was the Pearsons' interpretation not "the most reasonable interpretation of the deed," but "[n]o good reason exists why [the grantee] would need or desire to locate the access point" any farther than necessary from Beach Road-that is, any farther than necessary from the northwestern corner of the locus, the point closest to Beach Road. In sum, the judge determined, the 1927 deed located the right of way on Bayberry Road "at a definite point at or very near to the northwestern corner of the locus[.]"
Interpreting the deed as clearly placing the point at that location was an error of law, or, to the extent it was a finding of fact, clearly erroneous. The judge reasoned that locating the easement's beginning point at the northeastern corner of the locus would be "contradictory to the language of the deed." But no language in the deed specifies where along the northeastern side "the point" is. The judge also reasoned that locating that point at the northeastern corner was "unreasonable and unnecessary for [the grantee's] purpose-gaining access to a public way." But the deed refers to "purposes," in the plural, and expressly refers to permissible development of the locus,[8] which locating the easement at the northeastern corner would facilitate.[9] Indeed, as the judge acknowledged, when the 1927 easement was created, the grantor himself was in the process of subdividing his remaining lands.
Most significantly, reading the phrase "suitable for the Grantee's purposes" as meaning "suitable for the grantee to access Beach Road" would render the phrase superfluous, contrary to settled interpretive principles.[10] Even without that phrase, the 1927 easement would still have established "a right of way ... from a point at the Northeasterly side of the lot hereby conveyed to said Beach Road," plainly indicating that its purpose was to provide access to Beach Road. The phrase "suitable for the Grantee's purposes" must therefore have been intended to add some meaning. Its words reflect the grantor's understanding both that the grantee might have multiple purposes for the right of way and that the easement should accommodate those purposes.[11]
We do not mean to suggest that the deed clearly located the beginning point of the easement near the northeastern corner of the locus or at any other particular point along its northeastern boundary. We conclude only that the deed, considered in light of the factors mentioned in Adams, 64 Mass. App. Ct. at 389, cannot be read as clearly locating the beginning point at or near the northwestern corner. The "deed is ambiguous because its meaning, as far as the right of way is concerned, is uncertain and susceptible of multiple interpretations." Hamouda v. Harris, 66 Mass. App. Ct. 22, 26 (2006).
2. The Titus Plan. The 1927 deed, after the describing the locus by its metes and bounds, also referred to it as "the parcel of land marked '4 Acres' on a certain plan made by John E. Titus Landscape Architect, ... [r]evised February 7, 1927, said plan to be recorded herewith, and to which plan reference is to be had." The Titus Plan was never recorded and could not be located despite the parties' diligent efforts. The judge initially mentioned the Titus Plan in his findings of fact, but only to "infer" that it "quite likely" answered the question of where the 1927 grantor and grantee intended the easement to be.
In discussing the conclusions to be drawn from his findings, the judge went further:
"While it is not necessary for me to make such a finding to resolve the question tried to me, what I conclude occurred is that, in 1927, when [the grantor] sold the locus to [the grantee], there was already in existence a right of way leaving from the conveyed land along its northeastern side line, very close to its northwestern corner. This right of way headed from there in a northerly and westerly direction towards the Beach Road. It is fair to infer that this right of way, because it was in existence already, was known to the parties to the 1927 deed, and was depicted on the 1927 Titus Plan."
In the end, however, the judge placed considerable weight on the Titus Plan:
"As I have said, the deed's explicit reference to the 1927 Titus Plan proves that the parties looked to that plan specifically to memorialize and illustrate their agreement about the right of way's definite location. Their failure to record or preserve that plan leaves us today somewhat unsure where exactly that location of the easement was planted by the parties, but I harbor no uncertainty that they did fix the right of way in a specific place." (Emphasis added.)
We view this statement about the Titus Plan as an erroneous legal conclusion, or, to the extent it is a finding of fact, clearly erroneous. No language in the 1927 deed states or implies that a right of way is depicted on the Titus Plan or otherwise suggests any connection between the right of way and that plan. The deed does not, after referring to the right of way, state, "as shown on the Titus Plan," or anything to that effect. Indeed, the deed's only other reference to the Titus Plan, set forth in the margin,[12] shows that had the parties meant to refer to the Titus Plan to clarify what portion of the locus was meant by the deed's easement language, they knew how to do so.
Although the evidence did not compel a conclusion that the Titus Plan did not show the location of the easement, the judge's conclusion that it did show the location was speculative. The deed's references to the missing Titus Plan cannot support a determination that the parties definitely intended the easement to begin at a point at or near the northwestern corner of the locus.
3. Construing the deed against the grantor. "It is a rule in the construction of deeds, that the language, being the language of the grantor, is to be construed most strongly against him." Bernard v. Nantucket Boys' Club, Inc., 391 Mass. 823, 827 (1984), quoting from Thayer v. Payne, 2 Cush. 327, 331 (1848). This interpretive canon is useful when questions arise "from the ambiguity, brevity, or uncertainty of the descriptive words used." Atkins v. Bordman, 2 Met. 457, 463 (1841). The underlying rationale is that the grantor "selects the terms, and it [is] supposed that he will insert all that has been agreed upon beneficial to himself, and will be less careful to state fully all which is beneficial to the grantee." Johnson v. Jordan, 2 Met. 234, 240 (1841). Here, construing the 1927 easement most strongly against the grantor would mean that the undefined "point at the Northeasterly side of the lot" is located at or very near the northeastern corner of the lot, because a right of way originating at that point would burden more of the grantor's then-retained land than would a right of way originating at any other point along the northeastern side of the lot.[13]
The judge declined to apply this interpretive canon, for two reasons. First, he "observe[d] that this canon, where matters of description are concerned, is best and more often applied to resolve the tension between multiple distinctly conflicting provisions within a deed, and not so often to give meaning to one ambiguous descriptive provision." Based on the cases cited by the judge and the parties in their briefs, we express no view about where the canon is best or most often applied. But we know of no decision expressing a preference for applying the canon in the first class of cases, or suggesting that it is less useful in the second class, which includes the present case. The canon was applied in Estes v. DeMello, 61 Mass. App. Ct. 638, 641 (2004), a case involving a single purported condition on a deeded easement, and has been applied in several Land Court decisions, cited by the Pearsons, involving single disputed provisions. And the rationale for the canon, as stated in Johnson, supra at 240-241, appears equally applicable to both classes of cases.
Second, the judge declined to apply the canon because, although it can "help break a tie," it does not control in every case; in this case, "many other factors" supported locating the easement's beginning point at or very near the northwest corner of the locus, and there was "no occasion to apply the canon to upend the result called for by the clear weight of the evidence." But we have concluded above that the two principal factors the judge relied upon-the language creating the easement, construed in light of the factors mentioned in Adams, 64 Mass. App. Ct. at 389, and the deed's references to the Titus Plan-cannot be read as clearly locating the beginning point at or near the northwestern corner of the locus.
Therefore, it was error not to construe the deed most strongly against the grantor, meaning that the easement originates at a point at or very near the northeastern corner. This conclusion is subject to an important qualification, which we address after disposing of Bayview's cross appeal.
4. Bayview's cross appeal. Bayview argues that, if we vacate the judgment, we should not remand for the purpose of fixing the right of way's location and bounds, but instead should vacate three of the judge's findings-which Bayview contends went beyond the scope of the trial as originally defined by the judge[14] -and remand to allow Bayview to present fact witness testimony on those issues. We disagree.
a. First challenged finding. The first finding Bayview challenges is that the original right of way existed at a point along the northeastern side of the locus. Bayview asserts that its fact witnesses would have testified that as of the early 1950s, there was a "well-worn path" leading to Beach Road from the northwestern side of the locus (now the northwestern boundary of lot 1005A) over what is now the Russett parcel, and that this path is where the parties to the 1927 deed, notwithstanding its language, actually intended to locate the right of way. We find persuasive, however, the judge's reasoning that there was no reason to believe that, in and around 1927, the parties would have departed from the language of the deed in this manner.
To be sure, and as the judge recognized elsewhere in his decision, unclear language in a deed may be clarified by the parties' subsequent conduct and use of the land, "providing the acts relied upon are not so remote in time or so disconnected with the deed 'as to forbid the inference that they had relation to it as parts of the same transaction or were made in explanation or characterization of it.' " Boudreau v. Coleman, 29 Mass. App. Ct. 621, 632 (1990), quoting from Bacon v. Onset Bay Grove Assn., 241 Mass. 417, 423 (1922). In Boudreau, supra, actions taken between ten and sixteen years after the deeds in question were "removed in time" and "merit[ed] little weight in determining the presumed intent of the parties to [those] deeds." Id. at 632-633. In Bacon, supra, actions taken twenty years after a deed, see id. at 421, 424, were too "remote" to "show[ ] an intent proper to be considered in the construction of the deed." Id. at 424. It follows that here, even if a "well-worn path" observed in the early 1950s permitted an inference that the path was created as early as the late 1940s,[15] that would still be approximately twenty years after the 1927 deed, too remote in time to bear on the intent of the parties to that deed.
b. Second challenged finding. The second finding Bayview challenges is that the 1927 easement has an existence separate from the right of way over what is now the Russett parcel. Bayview asserts that its fact witnesses would have testified that the parties, by their conduct and acquiescence, relocated the 1927 easement to the right of way over the Russett parcel (or, put differently, substituted a right of way over the Russett parcel for the 1927 easement), pursuant to the principles stated in Proulx v. D'Urso, 60 Mass. App. Ct. 701, 705 (2004).[16] The judge found that there was no evidence of such a relocation; Bayview now argues that the judge should not have so found before hearing from its fact witnesses.
We disagree. Such a relocation can occur only by the conduct of "the parties," ibid., i.e., the dominant and servient estate owners. In this instance, such a relocation could have occurred only at a time when the original servient estate (the land to the northeast, over which Bayberry Road now passes) and the claimed substituted servient estate (the Russett parcel to the northwest) were under common ownership, so that their owner could relocate the easement from the former location to the latter with the acquiescence of the owner of the locus. Such common ownership existed through 1944, as of which time both parcels were owned by one Jacoby, a successor in interest to the original grantor (Carlton). But in December, 1944, Jacoby conveyed the Russett parcel to one Messenger. Thereafter, the Pearsons assert, the two parcels were not under common ownership, and Bayview has not disputed this point.[17] Thus no relocation as described in Proulx could have occurred after 1944. Because Bayview's fact witness testimony extends back no further than to what was observed in the early 1950s, the judge did not err or abuse his discretion in finding, without hearing that testimony, that no relocation had occurred.[18]
c. Third challenged finding. The third finding Bayview challenges is that the 1927 easement, as assertedly relocated under Proulx to run over the Russett parcel, had not been subsequently relocated by a 1995 instrument executed by the Russetts and the Pearsons. Bayview's argument is entirely dependent on its argument regarding the second challenged finding, which argument we have rejected above.
5. Fixing the right of way's location and bounds. We add an important qualification to our conclusion that the easement originates at a point at or very near the northeastern corner of the locus. "Where the instrument creating an easement does not fix its location or bounds, a court may do so in the absence of agreement by the parties." Cater v. Bednarek, 462 Mass. 523, 533 (2012). See Burnham v. Mahoney, 222 Mass. 524, 529 (1916). In doing so, "a judge inevitably will confront a conflict between a dominant estate and a servient estate, and 'the public policy favoring socially productive use of land generally leads to striking a balance that maximizes the aggregate utility of the [dominant] and servient estate.' " Cater, supra, at 533-534, quoting from Restatement (Third) of Property (Servitudes) § 4.10 comment b (2000) (Restatement). "This generally means that a judge should strike 'a balance between minimizing the damage to the servient estate and maximizing the utility to the [dominant estate],' ... recognizing that the holder of an easement is entitled to use the servient estate 'in a manner that is reasonably necessary for the convenient enjoyment' of the dominant estate." Id. at 534, quoting from Restatement §§ 4.8 comment b, 4.10. These principles are to be applied taking into account conditions at the dominant and servient estates as they exist at present. See Cater, supra at 527-530 & n.18 (recounting trial judge's application of principles in light of current conditions reflecting development since easement's creation); id. at 534 (concluding that "the judge ably applied these principles in establishing the location of the easement").
Here, although we have concluded that the right of way originates at a point at or very near the northeastern corner of the locus, the judge on remand (absent an agreement by the parties) should apply the Restatement's principles to fix the right of way's precise location and bounds. There may be a location along the northeastern boundary that better serves those principles than would a location at or very near the northeastern corner. We recognize that the right of way may remain appurtenant to both lots 1005A and 1005B. See Anzalone v. Metropolitan Dist. Commn., 257 Mass. 32, 36 (1926). But in light of the Restatement's principles, and of the fact that lot 1005A already enjoys access to Bayberry Road (and from there to Beach Road) via an easement over the Russett parcel that is distinct from the 1927 easement, we conclude that the right of way must originate entirely along the northeastern boundary of lot 1005 (not lot 1005A), as that is "reasonably necessary for the convenient enjoyment" of lot 1005B. Restatement § 4.10.
Conclusion. The judgment is vacated, and the case is remanded for further proceedings consistent with this memorandum and order.
So ordered.
Vacated and remanded.

For simplicity we will refer to the Pearsons as owners, while recognizing that the Southwest Trust is the owner of record.

Beach Road is known today as Little Harbor Road. For simplicity we refer to it herein as Beach Road.

The grantor conveyed most of this land in 1928, but reserved to himself a 5.8 acre parcel adjoining the southeastern boundary of the locus, along with a right of way from the northeastern boundary of his parcel, across what is now Bayberry Road, out to Beach Road. The record does not clearly reflect when and to whom the grantor subsequently conveyed his parcel, but there is no dispute that the parcel's ownership has changed and that it has been subdivided.

The judge further ruled that to the extent the Pearsons sought to establish such a non-record right over Bayberry Road, they could not do so in this case, but only in a separate action. The Pearsons challenge this ruling as an abuse of discretion. Because we rule in the Pearsons' favor on their claim of record rights, we need not reach this other issue.

The deed restricts development, but only until 1950, to "single private dwelling houses (each such dwelling house to cost not less than [$10,000], bathhouses and boat houses." The deed prohibits, but only until 1950, use of the locus "for livery stables, hotels, boarding-houses, shops or factories, [or] for any trade, business, public amusement or entertainment, whatsoever." We recognize that the judge rejected the testimony of one of the Pearsons' expert witnesses that the deed "reflect[ed] an intent to convey an easement that would facilitate a broad range of purposes and uses of the locus." Even if that range is not "broad," it still encompasses the types of development expressly envisioned in the deed.

The judge concluded that even if the grantee had been considering later subdivision, he would not have bargained with the grantor for the right to enter the locus any farther than necessary from its northwestern corner, because from there the grantee would have been able to reserve access across the most northwesterly new lot created by the subdivision to any other newly created lots. Although the grantee would have been able to do so, it would have been at least as advantageous to him to have the right to access such lots from a point closer to the northeastern corner of the locus, over the grantor's land instead of his own, using what is now Bayberry Road. The judge did not address this point.

"The principles governing interpretation of a deed are similar to those governing contract interpretation. In the case of the latter, [a]n interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable." Estes v. DeMello, 61 Mass. App. Ct. 638, 642-643 (2004), quoting from Jacobs v. United States Fid. & Guar. Co., 417 Mass. 75, 77 (1994).

The judge's findings of fact adopted the suggestion of Bayview's expert witness that the phrase "suitable for the Grantee's purposes" was "intended to refer to the method of travel set up in the easement, rather than the grantee's future use of the locus." The expert had testified that the phrase encompassed travel "on foot, with animal-drawn carriages ... toboggans, moving on to motor vehicles ... unless there were words of limitation as to the type of use, the type of vehicle of conveyance, that essentially it's wide open for whatever the grantee wants to use with it." But it is settled as a matter of law that a right of way, unless otherwise restricted, is "properly subjected to animal and vehicular use, the theory being that such use, being necessary to the reasonable and proper use and enjoyment of the dominant estate, was within the contemplation of the parties." Marden v. Mallard Decoy Club,Inc., 361 Mass. 105, 107-108 (1972) (quotation omitted). See Crosier v. Shack, 213 Mass. 253, 256 (1913) ; Swenson v. Marino, 306 Mass. 582, 586-587 (1940). The grantor's use of the phrase "suitable for the Grantee's purposes" was therefore not necessary to achieve this result, and so the phrase must mean something more. To the extent the judge found as fact that the phrase referred only to the method of travel, that finding was clearly erroneous.

The 1927 deed recites that certain restrictions apply to three particular portions of the locus. Those portions are first described individually, by reference to the deeds under which the grantor obtained title to them, and then collectively, by the phrase, "all of which land is shown on the plan of John E. Titus before referred to, and is there marked 'RESTRICTED,' to which plan reference is to be had."

We agree with the judge's conclusion that the easement's reference to "a point" at the northeastern side cannot reasonably be construed to mean any or every point along that side, as the Pearsons had argued.

The judge limited the trial to consideration of documents and expert witness testimony aimed at "the threshold (and potentially dispositive) issue of locating the record easement created in 1927." Other claims or theories asserted by the Pearsons were "held in abeyance" pending the result of the trial, recognizing that those claims and theories would involve additional fact witness testimony.

Bayview's brief states that its fact witnesses would provide testimony about "the right of way utilized since the 1940s," but Bayview cites no record support for this claim.

As stated in Proulx:
"[An] original easement may be deemed relocated when the conduct of the parties is such as to permit a conclusion that a different easement had 'been substituted for the way mentioned in the deeds' because the evidence reflects 'a tacit understanding or an implied agreement,' manifested by the dominant owner's 'acquiescence' in the use of the different easement in lieu of the original for a number of years."
Ibid., quoting from Anderson v. DeVries, 326 Mass. 127, 132 (1950). Anderson's separate statement that an easement cannot "be altered or changed without the consent of all parties in interest," 326 Mass. at 132, was abrogated in M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 90-91 (2004) (allowing servient estate owner to relocate easement unilaterally under conditions set forth in Restatement (Third) of Property (Servitudes) § 4.8(3) (2000). Bayview does not argue that such a unilateral relocation could have occurred or did occur here.

If Bayview's position were otherwise, we would have expected Bayview to so argue in a reply brief in support of its cross appeal. Nor does the record not allow us to determine that the two parcels came under common ownership after 1944.

We also note that the language of the 1927 deed placing the easement's beginning point "at the Northeasterly side of the lot" has continued to appear in each subsequent deed conveying the locus, including one in 1990.